IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID CAUVEL,  )
        Plaintiff  )    C.A. No. 08-134 Erie
                                 )
        v.  )
                                 )
SCHWAN HOME SERVICES, INC.,  )    Magistrate Judge Baxter
        Defendant.  )

**OPINION AND ORDER**

United States Magistrate Judge Susan Paradise Baxter.

**I.    INTRODUCTION**

    **A.    Relevant Procedural History**

On or about March 28, 2008, Plaintiff David Cauvel, a resident of Erie County, Pennsylvania, commenced this wrongful discharge action by filing a complaint in the Court of Common Pleas of Allegheny County, Pennsylvania, against his former employer, Defendant Schwan Home Services, Inc., a Minnesota corporation in the business of producing, selling, and distributing frozen food products. [ECF No. 1, Exhibit 1]. The action was removed to this Court by Defendant on May 5, 2008, pursuant to 28 U.S.C. § 1441(a), based on diversity of citizenship under 28 U.S.C. § 1332. [ECF No. 1]. Both parties have consented to the jurisdiction of the Magistrate Judge.

Plaintiff claims that Defendant's termination of his employment was wrongfully taken in retaliation for his refusal to submit to a polygraph test. As a relief for his claim, Plaintiff seeks to recover compensatory and punitive damages.

On May 23, 2008, Defendant filed an Answer, Affirmative Defenses and Counterclaim in response to Plaintiff's Complaint. [ECF No. 4]. The Counterclaim contains two Counts: breach of fiduciary duty and conversion. In support of these claims, Defendant asserts, among other things, that Plaintiff "either condoned and/or participated in the violation of corporate

1

policy, which resulted in the loss of property." (Id. at ¶ 26).

On June 11, 2008, Plaintiff filed a motion to dismiss Defendant's Counterclaim, arguing that it failed to state a cause of action upon which relief may be granted. [ECF No. 5]. The Court denied Plaintiff's motion by Opinion and Order dated January 9, 2009. [ECF No. 13].

On July 17, 2009, Defendant filed an Amended Answer, Affirmative Defenses and Counterclaim [ECF No. 28], asserting several new allegations against Plaintiff, and adding claims of breach of contract and fraud. In response, Plaintiff filed an Answer and Affirmative Defenses to Defendant's Amended Counterclaim. [ECF No. 30]. The parties have since completed discovery.

On April 7, 2010, Defendant filed a motion for summary judgment, seeking entry of judgment in its favor, as a matter of law, based upon its assertion that the record evidence clearly shows that the termination of Plaintiff's employment was not based upon his refusal to take a polygraph test, as Plaintiff claims. [ECF No. 37]. On the same date, Plaintiff filed his own motion for summary judgment as to Defendant's counterclaim of "embezzlement," asserting that he is entitled to judgment in his favor on such claim because Defendant "lacks the proof necessary to support its allegations that Plaintiff either took the money himself, or conspired with others to take the money, or permitted others to embezzle the money." [ECF No. 41].[1] Each party has filed a brief in opposition to the other party's motion for summary judgment [ECF Nos. 39, 52], and Defendant has also filed a reply to Plaintiff's opposition brief. [ECF No. 52]. The parties have also filed multiple statements of material facts, which the Court has reviewed in detail. [ECF Nos. 38, 42, 47, 49, 51]. The following factual recitation is derived from the material facts that are either undisputed or supported by substantial evidence of record, and is confined to only those facts that relate to the claims now at issue before the Court.

---

[1] The Court notes that Plaintiff repeatedly refers to Defendant's counterclaim of conversion as one of "embezzlement," which is clearly erroneous, as embezzlement is a criminal act, while conversion is a civil tort claim. Thus, any reference to Defendant's "embezzlement" claim will be more appropriately construed as a reference to Defendant's conversion claim. It is noted further that Plaintiff has not moved for summary judgment with regard to Defendant's other counterclaims of breach of fiduciary duty, breach of contract, and fraud. As a result, such claims will not be addressed here.

2

### B. Relevant Factual History

Defendant is in the business of producing, selling and distributing frozen food products to commercial and residential customers nationwide. (ECF No. 38, Defendant's Statement of Undisputed Facts, at ¶ 1). At all relevant times hereto, Plaintiff was employed by Defendant as the Location General Manager of Defendant's Erie Depot, where he managed approximately 15-17 employees, most of whom were route managers[2] and warehouse crew. (Id. at ¶ 3). As Location Manager, Plaintiff was responsible for following and enforcing Defendant's policies and procedures. (Id. at ¶ 13). Among them is Defendant's policy regarding employee theft of property, which states:

> The theft, attempted theft or unauthorized possession of any property or money belonging to the Company, another employee or any other person or firm when such property is under the care of the Company, whether such property is of value or not, is grounds for immediate discharge. You are expected and required to cooperate fully with the Company in any inspections or searches undertaken to determine compliance with this rule.

(Id. at ¶¶ 16-17). In addition, Defendant maintains a Loss Prevention & Recoupment Policy regarding the making of bank deposits of cash and checks collected from the deliveries of goods sold, which states, in pertinent part:

> It is an absolute responsibility that the Location General Manager ("LGM") will address missing deposits [or other] banking discrepancies of $50 cumulative or more per route manager per week by taking the following steps:
>
> (1) On a daily basis, the LGM will review the daily deposit logs or A48 report (or its equivalent) to identify missing deposits;
>
> (2) On a weekly basis, each Tuesday, the LGM will review the past weeks deposit log entries or will print and review the A48 Report (or equivalent) for the preceding work week (Sunday-Saturday). The purpose for reviewing each route manager at the depot is to identify field, office and banking shorts;

---

[2] Route managers are responsible for selling and delivering Defendant's frozen food products door-to-door. (Id. at ¶ 4).

> > (3) For any route(s)/route managers showing a missing deposit, except for overnight(s), or a field cash and/or office adjustment discrepancy of $50.00 or more the LGM will:
>
> > > (a) Receive electronic notice containing a web link from LPG/Treasury of a discrepancy;
>
> > > (b) Within 2 days (48 hours) complete the web form ...;
>
> > > \* \* \*
>
> > > (d) Where a missing deposit and/or cash discrepancy is not resolved within the 48 hours, the LGM will immediately contact the Law Department (names and numbers excluded for privacy) which, depending upon the investigative findings, may recommend the suspension of the responsible Route Manager, with or without pay, pending the further investigation of the loss and/or notify law enforcement of potential theft.

(Id. at ¶ 20). Failure to abide by the foregoing policy is grounds for disciplinary action, up to and including termination. (Id. at ¶ 21).

In addition to the foregoing, it is Defendant's corporate policy that, at the end of a route day, route managers are to place all cash and checks received from customers into a daily bank bag, which is to be sealed and deposited in the bank by the route manager on the same day. (Id. at ¶¶ 22-23). As Location General Manager, Plaintiff was responsible for ensuring that, upon completion of the daily route, each route manager counted the money collected, made out a deposit slip, placed the cash and checks in a sealed bank bag, and deposited the contents of the bank bag in the bank. (Id. at ¶¶ 24-25). Plaintiff was also responsible for ensuring that each route manager punched into a hand-held computer device ("HHC") the actual amount of money deposited in the bank. (Id. at ¶ 26). If the amount of money punched into the HHC did not match the amount of daily sales, the HHC would prompt the route manager to provide a reason for the discrepancy. (Id. at ¶ 27). Pursuant to Defendant's corporate policy, failure to abide by the foregoing procedures is grounds for disciplinary action, up to and including termination. (Id. at ¶ 28).

During Plaintiff's tenure as Location General Manager, Defendant's Erie Depot incurred

theft of property and money; bank deposits were made late and were short of the amount that should have been deposited, based on daily sales; checks and cash collected by route managers were being mixed up and deposited in different route managers' bank bags; and checks dated one day were being deposited in bank bags dated a different day. (Id. at ¶¶ 29-33). Due to the large amounts of missing funds and property, Defendant reported the matter to the Pennsylvania State Police, which conducted an extensive criminal investigation. (Id. at ¶ 39).

In May 2007, Plaintiff held a meeting at the Erie Depot and advised the route managers to give him their bank bags and he would deliver them to the bank after checking the contents of each bag to make sure their deposits were correct. After initiating this procedure, the theft problem stopped temporarily. (Id. at ¶ 40). After a brief hiatus, however, the theft problems resurfaced and, in September 2007, Plaintiff resumed delivering route managers' bank bags to the bank when he was in town. He continued to do this "off and on" until the State Police came to investigate the thefts. (Id. at ¶ 41). Defendant also began to conduct its own internal investigation of the thefts in or around mid-October 2007. Defendant's investigation was conducted primarily by Georgia Tirrel, Loss Presentation Specialist ("Tirrel"), Barry Adams, Human Resources Field Manager ("Adams"), and Gary Danbrook, Division Manager ("Danbrook"). (Id. at ¶ 42).

At first, no one suspected Plaintiff was responsible for the thefts, as he appeared interested in resolving the problems and cooperated with the investigation. As the investigation proceeded, however, Defendant began to believe that Plaintiff was personally involved and responsible for the thefts, and the police began to focus on him as a suspect. (Id. at ¶ 47). During the relevant period of time, Plaintiff: (i) was collecting bank bags from the route managers, which were, at times, unsealed, and delivering them to the bank himself; (ii) had direct access to cash and checks collected by route managers under his supervision; (iii) performed spot checks of route managers' bank deposit bags and never found any discrepancies; (iv) would, at times, close out route managers' HHC's that were left unclosed at the end of the night; and (v) would occasionally put money into a route manager's bank bag and seal the bag himself. (Id. at ¶¶ 48-52). Ultimately, over $ 50,000.00 in deposits were found

5

missing from the Erie Depot, in addition to thousands of dollars of products that were stolen from trucks parked on Defendant's property. (Id. at ¶ 53).

Corporal Kevin Calkins ("Calkins") and Trooper Jay McKee ("McKee") were the Pennsylvania State Police officers who conducted the criminal investigation. (Id. at ¶ 54). On August 3, 2007, and again on October 17, 2007, Calkins and McKee went to the Erie Depot to interview employees about the thefts. They also asked a number of the employees if they would be willing to take a polygraph test. (Id. at ¶ 55). Plaintiff's polygraph test was scheduled for October 26, 2007. (Id. at ¶ 56). The police advised Danbrook, Adams, and Tirrel of the scheduling of Plaintiff's test. (Id. at ¶ 57). Calkins told Tirrel, Danbrook, and Adams that the police would not release any of the test results to Defendant. (Id. at ¶ 60).

On the night before his scheduled polygraph test, Plaintiff informed Tirrel that, after talking to some of his family and friends, he was almost certain he was not going to take the test. (Id. at ¶ 66). On October 26, 2007, McKee reported to Tirrel that Plaintiff did not report for the polygraph test and asked if Plaintiff was on the premises. Tirrel then handed Plaintiff the phone, at which time Plaintiff informed McKee that he would not be appearing for the test. (Id. at ¶¶ 71-72).

On or about October 31, 2007, Plaintiff was placed on paid suspension pending the police and internal investigations regarding the late and missing deposits. (Id. at ¶ 77). At the time, it was suspected that Plaintiff may have been involved in the loss of the money and property. (Id. at ¶ 79). Plaintiff has admitted that no representative from Defendant ever informed him that he was suspended because he refused to take a polygraph test. (Id. at ¶ 84). Even if Plaintiff had taken the polygraph test and passed, Plaintiff remained responsible for the money and property losses at the Erie Depot. (Id. at ¶ 82).

On November 30, 2007, Adams and Danbrook went to the Erie Depot to meet with Plaintiff, at which time Plaintiff was terminated from his position as Location General Manager. (Id. at ¶ 87). The termination was memorialized in a letter of the same date, from Danbrook to Plaintiff, which indicated that Plaintiff was being terminated for "unsatisfactory performance." In particular, Danbrook cited Plaintiff's "fail[ure] to follow or enforce the mandates of the Loss

Prevention and Recoupment Policy" in connection with the missing deposits. [ECF No. 40-5]. Nonetheless, because of his long-standing career with Defendant, Plaintiff was offered two other positions with the company: a Sales Supervisor position in Westmoreland, New York, and a Customer Service Manager position in a location other than Erie, Pennsylvania. (Id.). Plaintiff rejected both offers.

### C.    Standard of Review

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of

proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 247-249.

## II. DISCUSSION

### A. Plaintiff's Wrongful Discharge Claim

The Third Circuit has recognized that an employer's violation of Pennsylvania's anti-polygraph statute constitutes a wrongful discharge under the public policy exception to the at-will employment doctrine. Perks v. Firestone Tire & Rubber Co., 611 F.2d 1363 (3d Cir. 1979). The anti-polygraph statute is codified at Section 7321 of the Pennsylvania Crimes Code and provides that:

> A person is guilty of a misdemeanor of the second degree if he requires as a condition for employment or continuation of employment that an employee or other individual shall take a polygraph test or any form of a mechanical or electrical lie detector test.

18 Pa.Cons.Stat. § 7321.

Plaintiff claims that he was wrongfully discharged because Defendant terminated his employment as a direct result of his refusal to submit to a polygraph test. Defendant counters that Plaintiff cannot show that he was required to submit to a polygraph test as a condition of continued employment, or that he was terminated because of his refusal to take the test. As a result, Defendant argues that it is entitled to summary judgment in its favor, as a matter of law.

In support of its summary judgment motion, Defendant has submitted affidavits from Calkins (ECF No. 40-4, Exhibit G), McKee (Id., Exhibit H), Tirrel (Id., Exhibit F), Adams (ECF No. 40-3, Exhibit C), and Danbrook (Id., Exhibit D), all of whom attest to the fact that the State Police were solely responsible for requesting and scheduling a polygraph test for Plaintiff. In fact, Calkins and McKee concur that the test was scheduled at Calkins' direction. (ECF No. 40-4, Exhibit G at ¶ 21; Id., Exhibit H at ¶ 8). All affiants further attest that no representatives from Defendant ever requested or demanded that a polygraph test be taken of Plaintiff. (See ECF No. 40-4, Exhibit G at ¶ 22; Id. Exhibit H at ¶ 8; Id., Exhibit F at ¶ 24; ECF No. 40-3, Exhibit C at ¶ 3; Id., Exhibit D at ¶ 11).

In rebuttal, Plaintiff has offered into evidence copies of the following email transmissions purportedly sent by Tirrel and Danbrook before and after the date on which Plaintiff's polygraph test was scheduled:[3]

> From: Georgia Tirrel
> Sent: Friday, October 19, 2007 3:42 PM
> To: Gary Danbrook DV00010
> Subject: Erie, Pa
>
> Is Dave [Plaintiff] aware of the polygraph Friday?

---

[3] Defendant vigorously disputes the authenticity of these emails and has, in fact, added a fraud count against Plaintiff in its amended counterclaim, alleging that Plaintiff manufactured these emails. In support of its fraud claim, Defendant has submitted a forensic analysis report from Kroll Ontrack, which indicates that there is no evidence of either electronic or hard copies of these emails in Defendant's backup tapes. (ECF NO. 50-2, Exhibit 7). Based upon this report, Defendant asks this Court to disregard the emails and to grant its summary judgment motion due to Plaintiff's alleged "fraud on the court." In response, Plaintiff contends that Defendant's expert report is "improper material" on which to support a summary judgment motion The Court finds it unnecessary to resolve this dispute because the emails, even if accepted as genuine, fail to satisfy Plaintiff's burden of showing that Defendant required him to submit to a polygraph test as a condition of his continued employment.

9

> From: Gary Danbrook
> Sent: Friday, October 19, 2007 3:24 PM
> To: Georgia Tirrel
> Subject: RE: Erie, Pa
>
> Yes, need location and time, we were talking yesterday and he was not sure he wanted to take it, I suggested he dies [sic] to clear his name, guess he had talked to his father and he recommended he not take it.

(ECF No. 51-1, Exhibit B)

*　　　　　*　　　　　*

> From: Georgia Tirrel
> Sent: Mon 10/29/2007 11:27 AM
> To: Gary Danbrook DV00010
> Subject: dave
>
> Gary, you need to speak to Dave about taking the polygraph, he trusts you and his position could depend on it. Right now with refusing it makes him look guilty. Delete Message.
>
>
> Subject: FW: dave
> Date: Mon 10/29/2007 12:11 PM
> From: Gary Danbrook DV00010
> To: Dave Cauvel DS05070
>
> Dave I wish you would reconsider taking the polygraph, as you can see it would clear you right away. Besides I know you'll pass you where [sic] out of town most the time this took place with me.

(ECF No. 51-1, Exhibit A).

      Plaintiff asserts that the foregoing emails and other "urgings" allegedly expressed by Defendant's management employees made him feel pressured to take the polygraph test. However, such conduct, even if true, does not rise to the level of requiring Plaintiff to take a polygraph test as a condition of his continued employment. In fact, in all of the reported cases upholding a plaintiff's wrongful discharge claim based upon an employer's violation of Pennsylvania's anti-polygraph statute, the polygraph test at issue was specifically requested by the employer. See, e.g., Perks, 611 F.2d at 1366 (finding factual inference that plaintiff was fired for refusing to take polygraph test where test was specifically requested by employer as a "final chance" for plaintiff to persuade employer that he did not improperly accept gratuities from suppliers); Molush v. Orkin Exterminating Co., Inc., 547 F.Supp. 54, 55 (E.D.Pa. 1982)(upholding wrongful discharge claim where employee underwent polygraph test at the

employer's "direction and insistence" and was then told that his employment was being "deferred until the conditions of employment were viewed and data submitted verified"); Leibowitz v. H.A. Winston Co., 342 Pa.Super. 456, 493 A.2d 111 (1985)(upholding wrongful discharge claim where employee was fired after failing two polygraph tests arranged by employer after money was found missing from safe).

Such is not the case here, as the undisputed evidence of record indicates that the polygraph test scheduled for Plaintiff was requested by the State Police as part of its ongoing theft investigation. As a result, this case aligns with the facts in Wright v. Commonwealth of Pennsylvania, 77 Pa.Cmwlth. 278 (1981), where the Commonwealth Court dismissed the plaintiff's wrongful discharge claim under Pennsylvania's anti-polygraph statute because the polygraph test at issue was administered by the police as part of its theft investigation, rather than the employer. In the absence of specific facts from which a reasonable inference may be drawn that Defendant required him to take a polygraph test as a condition of his continued employment in violation of Pennsylvania' anti-polygraph statute, Plaintiff has failed to satisfy the public policy exception to the at-will employment doctrine. As a result, summary judgment will be entered in favor of Defendant with regard to Plaintiff's wrongful discharge claim.

### B.     Defendant's Counterclaim of Conversion

Plaintiff has moved for summary judgment with regard to Defendant's counterclaim of conversion, arguing that Defendant "lacks the proof necessary to make out a *prima facie* case that Plaintiff had embezzled the money, or conspired with others to embezzle the money, or permitted others to embezzle the money." (ECF No. 41, Plaintiff's motion for summary judgment, at ¶ 7).

To establish a claim of conversion, Defendant must prove: (1) the deprivation of another's right of property in, or use or possession of, a chattel; (2) without the owner's consent; (3) and without lawful justification. McDermitt v. Party City Corp., 11 F.Supp.2d 612, 626 n.18 (E.D.Pa. 1998)(citations omitted). In Count II of its amended counterclaim, Defendant alleges that Plaintiff "wrongfully, willfully and unlawfully exercised dominion over" Defendant's

personal property, without Defendant's consent, and either converted the same to his own use or knowingly allowed and permitted the conversion by another third-party. (ECF No. 28, Amended Counterclaim at ¶ 55). It is undisputed that Defendant sustained a loss in excess of $ 50,000.00 in money and property, which was taken from Defendant without its consent and without legal justification. Thus, the only issue left to determine is whether Defendant can prove, by a preponderance of the evidence, that Plaintiff was legally responsible for the loss.

In this regard, the evidence of record shows that Plaintiff: (i) was collecting bank bags from the route managers, which were, at times, unsealed, and delivering them to the bank himself; (ii) had direct access to cash and checks collected by route managers under his supervision; (iii) performed spot checks of route managers' bank deposit bags and never found any discrepancies; (iv) would, at times, close out route managers' HHC's that were left unclosed at the end of the night; and (v) would occasionally put money into a route manager's bank bag and seal the bag himself. (ECF No. 38, Defendant's Statement of Undisputed Facts, at ¶¶ 48-52; ECF No. 51, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶¶ 48-52). In addition, a fact finder may consider the fact that Plaintiff refused to take a polygraph test, and that, as soon as Plaintiff was removed from the Erie Depot, the thefts ceased. (ECF No. 38 at ¶ 83). This accumulation of circumstantial evidence is sufficient to, at least, create a genuine issue of material fact as to whether Plaintiff could be found liable for conversion. Accordingly, Plaintiff's summary judgment motion will be denied.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID CAUVEL, | ) | |
|       Plaintiff | ) | C.A. No. 08-134 Erie |
| | ) | |
|     v. | ) | |
| | ) | |
| SCHWAN HOME SERVICES, INC., | ) | Magistrate Judge Baxter |
|       Defendant. | ) | |

### ORDER

AND NOW, this 30th day of December 2010,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [ECF No. 37] is GRANTED, and Plaintiff's Complaint is hereby DISMISSED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 41] is DENIED, and Defendant's counterclaims against Plaintiff shall proceed on their merits.

 

S/Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge